**GENERAL PUBLIC UTILITIES CORPORATION, Jersey Central Power & Light Company, Metropolitan Edison Company, Pennsylvania Electric Company, Appellees,**

v.

**UNITED STATES of America, Appellant.**

**No. 83–1017.**

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1983.

Decided Sept. 28, 1984.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Peter F. Vaira, Jr., U.S. Atty., Philadelphia, Pa., Jeffrey Axelrad, Director, Torts Branch, James P. Klapps, Special Counsel (argued), K. Roxanne McKee, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for appellant; E. Leo Slaggie, Acting Sol., Michael B. Blume, Juan L. Rodriguez, Nuclear Regulatory Commission, Washington, D.C., of counsel.

David Klingsberg (argued), Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellees; Milton Handler, Myron Kirschbaum, Aaron Stiefel, James B. Liberman, DeBevoise & Liberman, New York City, Samuel B. Russell, Ryan, Russell & McConaghy, Reading, Pa., of counsel.

Before WEIS, HIGGINBOTHAM, and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Alleging that the Nuclear Regulatory Commission failed to warn them of equipment defects, the owners of the Three Mile Island nuclear facility seek substantial damages attributed to a valve failure at the plant. We conclude that the claims against the government are barred by the discretionary function exception of the Federal Tort Claims Act.

The plaintiffs' complaint asserts a right to recover under the Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, because the Commission did not comply with statutory directives or its own regulations. The government moved to dismiss, asserting the discretionary function and misrepresentation exceptions to the Act, *id.* §§ 2680(a), (h). The district court denied the motion but *sua sponte* certified its order as one involving a controlling issue of law under 28 U.S.C. § 1292(b). We accepted the appeal.

Plaintiffs own and operate the Three Mile Island Unit No. 2 nuclear facility in

Londonderry Township, Pennsylvania.[1] Their complaint seeks more than four billion dollars in damages.

On March 28, 1979, a pilot-operated valve at Unit No. 2 failed to close properly, causing the reactor's coolant system to lose significant quantities of water and steam. The instruments that should have indicated that the valve remained open incorrectly showed it as being closed. A series of procedures undertaken in the belief that the valve was closed deprived the reactor of proper coolant, and it began to overheat. The nuclear core and protective claddings were severely damaged, resulting in the staggering financial losses to plaintiffs.

The complaint is in two counts. The first alleges that the Nuclear Regulatory Commission failed to exercise due care to discover, analyze, and warn of safety hazards. In particular, Count I alleges that in September 1977, 18 months before the Three Mile Island incident, a similar event occurred at the Davis-Besse nuclear power plant in Ohio. That facility was operated by the Toledo Edison Company and had been designed by the Babcock & Wilcox Company, which also prepared the plans for Three Mile Island.[2] Plaintiffs contend that the Commission failed to properly forward information to them about the cause of the Davis-Besse failure as well as the corrective measures developed to prevent similar occurrences.

The second count complains that the Commission negligently approved the Three Mile Island design and construction plans at a time when it knew or should have known that the pilot-operated relief valve could stick and cause a loss-of-coolant accident. Plaintiffs allege that the agency failed to require the manufacturer, Babcock & Wilcox, to analyze small breaks in a coolant system such as the one that was caused by the faulty valve at Three Mile Island.

In ruling on the government's motion to dismiss, the district court reviewed the Commission's statutory authority and the methods it uses to collect and disseminate safety information. Owners and operators are required to notify the Commission of defects in a facility that would create a substantial safety hazard, and the Commission is obligated to submit reports to Congress listing "abnormal occurrences." This information is also to be given wide dissemination to the public.

In carrying out its responsibility, the Commission has developed a series of mechanisms for the exchange of information with licensees. When the most serious events occur, a Bulletin is issued. It requires a response and may direct licensees to take specific action on a one time basis. For lesser degrees of danger, the Commission distributes a Circular, which does not mandate action or necessitate a reply. Other information worthy of general distribution is provided in Licensee Event Reports. NRC Inspection and Enforcement Manual, Chap. 1125 (1977).

A Licensee Event Report was used to describe the Davis-Besse incident and was sent to plaintiffs and other licensees in January 1978.[3] No further warning or information was given to plaintiffs, and their operating license was issued by the Commission in February 1978.

The theories of liability asserted in the complaint are negligence, negligence per se, and the "Good Samaritan" rule of the

---

1. Plaintiffs Metropolitan Edison Company, Jersey Central Power & Light, and Pennsylvania Electric Company all sell electrical energy to retail customers and other electrical companies. Each owns an interest in Three Mile Island Unit No. 2. Plaintiff General Public Utilities Corporation is a holding company owning all of the common stock of the electric companies. In March 1979, Metropolitan Edison was the operator of Three Mile Island Unit No. 2.

2. Plaintiffs have also filed a suit against Babcock & Wilcox, alleging that it knew of the Davis-Besse incident but nevertheless completed Three Mile Island Unit No. 2 with a defective valve.

3. There is no reference to this report in the plaintiffs' complaint, but the district court observed that "plaintiffs do not, however, contest defendant's assertion that they received a Licensee Event Report."

Restatement (Second) of Torts §§ 323 and 324A. Plaintiffs allege that they relied on the Commission but it failed to exercise due care in the performance of its undertakings. The district court concluded that the Energy Reorganization Act imposed a duty on the Commission to monitor the nuclear energy industry and alert licensees to safety problems.

Although the district court construed the complaint to essentially allege a failure to warn, it determined that the misrepresentation exception to the Tort Claims Act did not apply because the plaintiffs' losses were the result of the government's failure to disclose safety, not commercial, information. The district judge also rejected the Commission's contention that the discretionary function exemption barred the suit, observing that the "governing standards are not so vague or inexact as to call for unfettered scientific 'discretion.'" When decisionmakers exceed the scope of applicable regulations, he reasoned, the government cannot invoke the discretionary function exception.

After denying the motion to dismiss, the court certified the following question for immediate interlocutory review: "Is our decision correct that neither the misrepresentation nor the discretionary function exception bars this suit?"

Because the statutory exceptions constitute retentions of the sovereign immunity that is otherwise waived in the Act, a negative answer to either of the grounds for the district court's decision will require dismissal of the plaintiffs' suit. We do not discuss the misrepresentation issue because we conclude that the discretionary function exception applies to this case.[4]

One of the cases relied on by the district court in reaching its conclusion was *United Scottish Insurance Co. v. United States,* 692 F.2d 1209 (9th Cir.1982). Shortly after the district court issued its order, the Supreme Court granted certiorari in *United Scottish* and consolidated it with *S.A. Empresa De Viaco Aerea Rio Grandense (Varig Airlines) v. United States,* 692 F.2d 1205 (9th Cir.1982). The Supreme Court had not decided those cases when the case at bar was presented to this panel. In view of their relevancy, we chose to await the Court's action. Following the Court's reversal of both cases, *United States v. S.A. Empresa De Viaco Aerea Rio Grandense (Varig Airlines),* — U.S. —, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), we asked the parties to comment on the decision.

In the *Varig* cases, the plaintiffs asserted liability against the United States under the Tort Claims Act on allegations that the Federal Aviation Administration had negligently certified commercial aircraft. In each instance, an in-flight fire had caused damage to the plane resulting in deaths and injuries.

Suits were brought by representatives of the deceased passengers and the owners of the planes. The plaintiffs contended that the FAA certified the planes despite nonconformity with the agency's fire protection standards and, because of this negligence, the government was responsible in damages.

The Supreme Court disagreed, stating that when the discretionary function exception is invoked the basic inquiry is "whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." — U.S. at —, 104 S.Ct. at 2764. The discretionary function exception "plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Id.*

---

4. Section 2680(a) provides that the Torts Claims Act shall not apply to:

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or perform-ance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

28 U.S.C. § 2680(a).

In the legislative history, the Court discerned a marked emphasis on protection for regulatory activities. This suggested that an underlying basis for excepting discretionary functions was a congressional desire to prevent the use of a tort action as a vehicle for "judicial 'second guessing'" of administrative decisions grounded in social, economic, and political policy. *Id.*

The Court reviewed the FAA's design regulations as well as its compliance procedures and concluded that when an agency determines the extent to which it will supervise the safety procedures of private individuals, it "is exercising discretionary regulatory authority of the most basic kind." *Id.* at ——, 104 S.Ct. at 2768. The Court noted that FAA employees conducting compliance reviews "were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources." *Id.*

In holding that the plaintiffs' suits were barred, the Court also discussed *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), a decision whose continued vitality had been questioned in recent years. The Court rejected "the supposition that *Dalehite* no longer represents a valid interpretation of the discretionary function exception." —— U.S. at ——, 104 S.Ct. at 2764.

*Dalehite* was a claim against the United States for massive damages resulting from a disastrous explosion of fertilizer in the harbor at Texas City, Texas. The government was charged with various acts of negligence: the cabinet level decision to institute the fertilizer program, the failure to conduct further experimentation into the possibility of explosion, deficiencies in the drafting of a basic plan of manufacture, and the failure to properly police the loading and storage of the fertilizer aboard ships.

In holding for the government, *Dalehite* concluded that the discretionary function exception encompassed more than the initiation of programs and activities. It included determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. "Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." 346 U.S. at 35–36, 73 S.Ct. at 967–968.

*Varig* and its reaffirmation of *Dalehite* has reduced some of the uncertainty generated by the numerous courts of appeals' decisions that have wrestled with the vague contours of the discretionary exception.[5] Our canvas of authorities is accordingly narrow, and our task is to determine if the actions of the Nuclear Regulatory Commission fall within the *Varig* and *Dalehite* perimeters.

It should be noted that the issue of negligence is not relevant to the discretionary function inquiry. Moreover, in the procedural posture of this case, we assume that the government did not exercise due care. The question is whether the challenged conduct comes within the exception. We consider seriatim the allegations of the plaintiffs' complaint.[6]

The first count charges that the Commission either did not sufficiently investigate the Davis-Besse incident or, having obtained information that could have been used to correct the dangerous condition, failed to convey that information to plaintiffs. Thus, the attack is on the thoroughness of the investigation or, as an alterna-

---

**5.** For a review of some of the pre-*Varig* cases, see *Bernitsky v. United States*, 620 F.2d 948 (3d Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). *See also* Reynolds, "The Discretionary Function Exception of the Federal Tort Claims Act," 57 GEO. 81, 82 (1968); Comment, "Scope of the Discretionary Function Ex-

ception under the Federal Tort Claims Act," 67 GEO. L.J. 978 (1979).

**6.** Because of our disposition of this appeal, we need not discuss the "Good Samaritan" theory advanced by plaintiffs since that contention would do no more than establish negligence.

244

tive, the failure to communicate safety information in the agency's possession.

The Energy Reorganization Act gives the Commission the responsibility to "[r]eview the safety and safeguards of all [nuclear] facilities, materials, and activities." 42 U.S.C. § 5843(b)(2). The statute specifies that "such review functions shall include but not be limited to—(A) monitoring, testing and recommending upgrading of systems designed to prevent substantial health or safety hazards." *Id.* The Commission is also required to submit reports on "abnormal occurrences"—"an unscheduled incident or event which the Commission determines is significant from the standpoint of health or safety." *Id.* § 5848.

To assist the Commission in the performance of its safety function, section 206 of the Act requires owners and operators to notify the agency when a facility "contains a defect which could create a substantial safety hazard, as defined by regulations which the Commission shall promulgate." *Id.* § 5846(a)(2). To insure compliance, the Commission "is authorized to conduct such reasonable inspections and other enforcement activities as needed." *Id.* § 5846(d).

Although the statute directs the Commission to review the safety of nuclear facilities, the means of accomplishing that duty has been left to the agency. Section 203(b)(2) provides a nonexhaustive listing of "review functions" and, by implication, allows the Commission to add others. For example, the agency has, by regulation, undertaken a program of "notifying licensees regarding generic problems so as to achieve precautionary or corrective measures." 10 C.F.R. § 1.64 (1978).

The Act also assigns to the Commission the determination of what events constitute an "abnormal occurrence" or a "substantial safety hazard" that triggers the obligation of owners and operators to report defects, *see* 10 C.F.R. § 21.3(k) (1978). As to enforcement, the agency has the authority, not only to conduct inspections, but to develop "other enforcement activities as

needed." Thus, the Commission has decided that it may, in some circumstances, issue a Bulletin requiring licensees to take specific action in aid of the investigation and evaluation of an event.

In *Varig,* the plaintiffs challenged the FAA's practice of insuring compliance through a "spot check" system and its use on the defective planes. *See* —— U.S. at ——, 104 S.Ct. at 2766–68. The Court found both actions within the discretionary exemption stating, "Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program." *Id.* at ——, 104 S.Ct. at 2768. Agencies are required to balance "the objective sought to be obtained against such practical considerations as staffing and funding." *Id.* Therefore, the FAA's alleged failure to check specific items in the course of certification fell squarely within the discretionary function exception of section 2680(a).

That same analysis applies to the circumstances here. Congress has directed the Commission to pursue safety-related functions in the nuclear energy field, but has left implementation to the agency's " 'judgment of the best course.' " *Varig,* —— U.S. at ——, 104 S.Ct. at 2769 (quoting *Dalehite,* 346 U.S. at 34, 73 S.Ct. at 967). Thus, the Commission determines what information should be collected and how, whether incidents are to be investigated and in what manner, and what data should be disseminated and in what form. In formulating the means to accomplish its regulatory objectives, the agency must engage in the same balancing the Court spoke to in *Varig.*

That reasoning is no less applicable to the plaintiffs' allegation that the Commission's investigation of the Davis-Besse incident was wanting. Limitations on an investigation into matters that come within the regulatory control of the Commission are no different in principle than the FAA's use of a spot check system. The intensity and breadth of an investigation is necessar-

ily influenced by the resources available, both in terms of technically-trained personnel and funding. Of necessity, judgments must be made as to priorities and allocations of resources.

■ That in hindsight the Commission's judgment may have been ill-advised in no way changes the character of the function under scrutiny. The extent and scope of an investigation remains a matter of the agency's discretion. As this court stated in *Bernitsky v. United States,* 620 F.2d 948, 955 (3d Cir.1980), "Decision making as to investigation and enforcement, particularly when there are different types of enforcement action available, are discretionary judgments."

Count I's accusation of failure to furnish information in the agency's possession has several aspects. Plaintiffs complain that, although it should have been widely disseminated, "vital information regarding safety hazards was not sent out in any form." A fair statement of their position is not that they were totally unaware of the Davis-Besse occurrence, but that the Commission had specific data that it was under a duty to circulate to all who might be affected by a similar hazardous condition.

In essence, plaintiffs challenge the Commission's failure, on the basis of the information it had, to characterize the Davis-Besse event as either an "abnormal occurrence"—which the statute required it to report—or a "generic problem"—for which the regulations specified notification. They argue that because of the possible catastrophic consequences of a valve failure, the Commission had no discretion under the governing statutes and regulations—it was duty bound to report the incident.

■ Use of the word discretion in this sense exposes the fundamental flaw in the plaintiffs' position. The exemption from the Tort Claims Act is based on the nature of the governmental discretionary function, not whether there is an option to choose.

Regulatory activities are within the exemption, not because alternatives exist in particular circumstances, but because of the fundamental character of the role assigned to the agency.

If a government employee performing a discretionary function acts negligently, the exemption remains applicable even though the activity constitutes an abuse of discretion. As the statute itself provides, discretionary functions are exempt "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The Energy Reorganization Act's mandate that the Commission provide information on "abnormal occurrences" is triggered by the happening of "an unscheduled incident or event which the Commission determines is significant from the standpoint of public health or safety." 42 U.S.C. § 5848. Thus, before the obligation to disseminate information attaches the Commission is required to judge whether the incident raises concerns about public health or safety.

The legislative history leaves no doubt that this determination has been entrusted to the discretion of the Commission. The Senate had left "abnormal occurrence" undefined in its bill, but intended that the Commission develop "uniform criteria." Sen.Rep. No. 980, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 5470, 5531. The Conference Committee, however, added the definition that appears in the statute "to make it clear that the Commission will determine which abnormal occurrences are significant enough to be reported." Conf.Rep. No. 1445, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad.News 5538, 5551.

Whether an event is significant from the standpoint of health or safety may be easily determined in some situations—perhaps even by a layman unacquainted with nuclear energy technology. In other instances, however, it may require scientific sophistication to understand the factual data before even approaching the second question

of effect on public health and safety. The Commission's manual on "abnormal occurrences" states that "[w]hether a particular event will be determined to be an abnormal occurrence will depend on the specific facts and circumstances of the event."

The plaintiffs' theory—that the Davis-Besse event gave no alternative but to report—must not be allowed to obscure the nature of the Commission's function: that is, to determine on the basis of information in its possession whether a specific event constitutes "an abnormal occurrence" that requires notification to Congress and the public. This is not a mere ministerial task. Technical and scientific evaluations of nuclear processes and facilities must be taken into account along with considerations of public health and safety—matters within the specialized knowledge of the Commission.

In following the dictates of the statute, the Commission is unquestionably acting in its role as regulator of the conduct of private individuals. *See Varig,* —— U.S. at ——, 104 S.Ct. at 7764. Moreover, excluding the Commission's role from the scrutiny of a tort action provides an example of the underlying reason for the discretionary function exclusion—to prevent judicial second-guessing.[7]

There is no substantial distinction between the choice made by the FAA as to its method of inspection and decisions made by the Nuclear Regulatory Commission to classify certain incidents as statutory "abnormal occurrences." If anything, the discretion entrusted to the Commission would seem to be greater than that given the FAA.

In *Dalehite,* the Court used very broad language—"where there is room for policy judgment and decision there is discretion." 346 U.S. at 36, 73 S.Ct. at 968. The discretionary tag the Court attached to the government's specifications of bag labels and bills of lading in *Dalehite, see id.* at 39, 73 S.Ct. at 969, implicate far less of a policy determination than the classification of a nuclear event as an abnormal occurrence.

Plaintiffs rely on our case of *Griffin v. United States,* 500 F.2d 1059 (3d Cir.1974), as excluding professional and scientific judgments from the discretionary category. *Griffin* contrasted that type of decision-making with policy determinations in the social and economic realm. *Griffin,* however, must be read cautiously because in *Varig* the discretionary exception covered an agency decision that rested on highly technical information.[8] In any event, we find a distinct difference between applying rigid scientific specifications in a testing procedure and the making of a judgment on public health and safety after evaluating the happening of an out of the ordinary event at a nuclear power facility.

---

**7.** After defining "abnormal occurrence," section 208 of the Energy Reorganization Act continues: "Nothing in the preceding sentence shall limit the authority of a court to review the determination of the Commission." 42 U.S.C. § 5848. Although this provision might appear to suggest some relaxation of the opposition to judicial "second-guessing" of the Commission's determination, there is a marked difference between direct judicial review of an agency decision and contesting that decision through the medium of a tort suit. Not only are the standards in the two proceedings likely to differ, but a tort action could have an undesirable inhibiting effect on official activity and decisionmaking. *See United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963).

**8.** In *Griffin,* the government was found liable for negligent approval of a batch of polio vac-

cine. The panel majority held the discretionary function exception inapplicable because the "decision involve[d] not public policy but a scientific judgment as to the accuracy of test results." 500 F.2d at 1066 n. 16. In addition, the government employees had relied on a factor not in the regulations, and the court held that "[t]he violation of a discretionary command takes what otherwise might be characterized as a 'discretionary function' outside the scope of the statutory exception." *Id.* at 1068–69. Judge Van Dusen dissented, concluding that a function was no less discretionary because it was scientific. We need not determine the continued vitality of *Griffin* here, but note that our pre-*Varig* cases on the discretionary function must be re-evaluated.

What we have said is equally applicable to the plaintiffs' contention that it should have been given information about the Davis-Besse incident because the Commission knew or should have known that the problems at the Ohio plant were "generic." *See* 10 C.F.R. § 1.64. The same considerations and balancing that go into the agency's determinations about investigation, evaluation, and information exchange are at work in the identification of generic problems. The program for notifying licensees of generic problems is but one part of the overall discretionary function the Commission undertakes when it monitors the safety of the nuclear industry.

■ We conclude, therefore, that Count I of the plaintiff's complaint comes within the discretionary function exemption. Count II, which alleges that the Commission failed to exercise due care in licensing the Three Mile Island plant, requires less discussion. An agency entrusted with the task of approving entities for licensing is engaged in activity that is at the heart of the regulatory function.

Section 182 of the Atomic Energy Act of 1954, 42 U.S.C. § 2232 (1982), governs the Commission's review of license applications, *see id.* at § 5843(b). Applicants are to submit "such information as the Commission ... may determine to be necessary to decide" the qualifications of the applicant and such technical information "as the Commission may ... deem necessary in order to enable it to find that utilization or production of special nuclear material ... will provide adequate protection to the health and safety of the public." The statute allows the Commission to determine what amount of information is needed when it is passing on an application for a license.

Exercising its authority, the Commission decided to consider numerous factors. These include the site for the facility, its design, the materials and method of construction, the plant's safety features and procedures, the financial qualifications of the applicants, the technical expertise of the operators, and the adequacy of the applicants' quality assurance program for all stages from design through operation. *See* 10 C.F.R. Parts 50 (facilities), 55 (operators), 100 (site criteria). Each of these considerations is part of the Commission's overall objective of ascertaining whether there is a reasonable assurance that the nuclear facility can be operated without endangering the health and safety of the public. 10 C.F.R. §§ 50.35(c), 50.57(a)(3) (1978).

Plaintiffs allege that the Commission acted negligently when it approved the Babcock & Wilcox design because the agency "should have known that it was necessary to require manufacturers ... to analyze small breaks in the reactor coolant system such as a stuck-open pilot-operated relief valve." According to the complaint, the safety analyses submitted by Babcock & Wilcox generally considered small breaks of only about five square inches. The valve that malfunctioned in the Three Mile Island incident had an aperture of approximately one square inch.

When an agency determines the amount of information needed to fulfill its regulatory mission, it is exercising the essence of a discretionary function. *Varig* leaves no doubt on that score. As we noted earlier, an action will not lie under the Tort Claims Act for an abuse of the agency's discretion.

It is also appropriate to take note of statements on the Commission's licensing role in the congressional Conference Report to the Energy Reorganization Act. After pointing out that the Commission would have certain research capabilities that "may be characterized as confirmatory assessment," the Report states that "[i]f the license application is inadequate *in any respect considered significant by the regulatory agency,* the license is refused." Conf.Rep. No. 1445, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 5538, 5548 (emphasis added). The Report continues:

"It would be a serious mistake, however, to make a regulatory agency responsible for the performance of research that goes beyond the need for confirmatory assessment.... The regulatory agency should never be placed in a position to generate, and then have to defend, basic design data of its own....

"As with research, the regulatory agency need not and should not perform process development, develop construction procedures or designs, or conduct quality control work (which is the responsibility of the licensee or vendor).... The regulatory agency should not assume any part of the burden of the applicant to prove the adequacy of a license application."

*Id.* at 5548–49.

It is the burden and responsibility of the applicant to demonstrate the adequacy of its application. The Commission's obligation is to assess the application according to what the agency determines is significant from the standpoint of health or safety. The exercise of this authority falls squarely within the discretionary function. Therefore, Count II is also excluded by the discretionary function exemption of the Tort Claims Act.

Consequently, in response to the question submitted by the district court, we answer that the discretionary function exception is a bar to the plaintiffs' suit in this case. This case will therefore be remanded to the district court for proceedings consistent with this opinion.

