Lucille A. WHITE, Individually and as Administratrix of the Estate of Gerald J. White, deceased, Gerald J. White, a minor, Gary J. White, a minor, and Sara White, a minor, by and through Lucille A. White, Parent and Natural Guardian, Plaintiffs,

v.

UNITED STATES of America, DEPARTMENT OF INTERIOR, Defendants.

Civ. No. 83–1360.

United States District Court, M.D. Pennsylvania.

June 19, 1986.

---

5. *Terk v. Gordon,* 436 U.S. 850, 98 S.Ct. 3063, 56    L.Ed.2d 751 (1978) (per curiam).

See also, M.D.Pa., 639 F.Supp. 82.

Joseph A. Quinn, Jr., Neil L. Conway, Hourigan, Kluger, Spohrer & Quinn, Wilkes-Barre, Pa., for plaintiffs.

James J. West, U.S. Attys. Office, Scranton, Pa., Paul F. Figley, Asst. Director, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

OPINION

HERMAN, District Judge.

This suit arises out of the death of Gerald White on May 21, 1982 at the site of a federal mine reclamation project in Scranton, Pennsylvania. Plaintiffs have sued the United States under the Federal Tort Claims Act, claiming that negligence of the United States in planning and supervising the filling of the Pine Brook Shaft caused this death, and that the United States should therefore respond in damages.

This case is now before us on the defendant's motion for summary judgment. Defendant argues first that plaintiffs' claims are barred by the discretionary function exception to the general waiver of sovereign immunity found in the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(a). Second, defendant argues that plaintiffs' claims are barred by the misrepresentation exception to the Act, *see*, 28 U.S.C. § 2680(h), and finally, defendant argues that plaintiffs' claims are barred because they amount to vicarious liability theories, or, in the alternative, because the United States is immune from a tort suit as Mr. White's statutory employer under Pennsylvania law. Because we hold that Plaintiffs' claims are in fact barred by the discretionary functions exception and therefore, that this court does not have subject matter jurisdiction over the case, we will not address defendant's second and third arguments.

I. UNDISPUTED FACTS

Because we are addressing a summary judgment motion, we must first determine the material facts that are not disputed by the parties. If a fact is in dispute, we will assume, for the purposes of this memorandum only, that the fact is as plaintiffs' affidavits, depositions, and allegations purport it to be.

The undisputed facts as they appear to be from the affidavits, depositions, and other submissions of the parties are as follows. In 1980, the United States Bureau of Mines identified Pine Brook Shaft and a number of other mine shafts in northeastern Pennsylvania as potential hazards. Pursuant to the authority granted to the Secretary of the Interior in the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1239, the Bureau of Mines and subsequently the Office of Surface Mining, through their branch offices located in the Wilkes-Barre–Scranton area, began planning to backfill and cap these shafts to prevent potential accidental entry and collapse or settlement of the surrounding ground.

In drawing up the specifications for the filling projects, the Bureau of Mines considered various alternatives for correcting the hazard presented by Pine Brook Shaft. The original plan called for backfilling the shaft with mine rock ranging in size from boulders to silt particles. Subsequently, the Bureau decided to change the size of the rock material to no less than five inches and no more than twenty inches, and to specify that hardcore rock, rather than mine refuse be used. These changes were made in accordance with recommendations contained in a National Coal Board of England publication entitled, "Treatment of Disused Mine Shafts and Adits." *See* Exhibit E to Declaration of Richard J. Seibel: Memorandum dated October 8, 1981, to T.P. Flynn, from Arthur Borchert. In the final specifications that the Bureau supplied to the potential bidders for the filling contract, the Bureau required that the three compartments of the Pine Brook Shaft "be filled one at a time. Due to the unknown condition (strength) of the shaft's sidewalls, the backfill material shall be dumped on the surface adjacent to the opening. The material shall then be pushed by mechanical means into the void." "Backfilling Shafts: Scope of Work" Section of Contract, at 3.

In order to prepare the shaft for filling according to the above method, the contract required that "[t]he existing concrete wall and steel mesh cover [the birdcage] shall be removed to ground level, the concrete cap removed and the shaft filled." The contract also provided, immediately after the specification requiring the contractor to completely remove the existing cap at the Pine Brook Shaft, that,

It is the responsibility of the contractor to provide for the security of all shafts ... from the time the contractor starts until the final project work is approved. This will include but not be limited to

fences, gates, warning lights, etc. The contractor's personnel are to be informed that the stability of the caps and the sidewalls of the shafts are unknown and safety gear shall be used while work is in progress around the shafts.

"Backfilling Shafts: Scope of Work" Section of Contract, at 4. Additionally, the contract required the successful bidder to "take proper safety and health precautions to protect the work, the workers, the public, and the property of others," and to "comply with all applicable occupational safety and health standards relating to construction prescribed in 29 C.F.R. Part 1926." "General Provisions" Section of Contract at 3 and "General Conditions" Section of Contract at 3.

As a preliminary step to letting the above-described contract, the Office of Surface Mining, as successor to the Bureau of Mines, held a pre-bid conference on April 9, 1982, to brief potential bidders on the required work. David Simpson, Chief of the Division of Federal Demonstration Projects and head of the Office of Surface Mining's Wilkes-Barre office, and another employee conducted the meeting. In addition to explaining the filling procedures to be used and the reasons for their use, Simpson informed the contractors present, including the eventually successful contractor, that they would have access to the government's files on the proposed project for use in preparing their bids. Pre-Bid Conference Memo (Plaintiff's Trial Exhibit 90); Deposition of David G. Simpson at 31.

A few days later the contractors assembled at Pine Brook Shaft to view the work site and condition of the cap. On this occasion, Mr. Alfred Bernabei, one of the partners in Empire Contracting Company, the eventually successful bidder, asked Art Borchert, the technical project officer for the Pine Brook project, whether just one hole could be put in the cap by removing the steel mesh birdcage and the shaft filled through that single hole. Pre-Bid Conference Memo, *supra;* Deposition of Alfred Bernabei at 18. The contractor proposed to fill the shaft three-quarters of the way up before removing the entire concrete wall and cap in order to "secure the side-walls of the shaft." Deposition of Michael J. Naples, Jr. at 37. Borchert replied that the entire cap had to be removed before the fill operation began because the Pine Brook Shaft had three separate compartments. Apparently, removing the birdcage alone would provide access to only one of the three compartments. Borchert explained that the cap had to be completely removed "so that all the shaft compartments could be filled evenly and not overload one compartment that could collapse and bridge the adjoining compartment with timbers and rock, thus leaving a void beneath." Pre-Bid Conference Memo, *supra.*

The Office of Surface Mining eventually awarded the contract for filling Pine Brook Shaft and several other shafts to Empire Contracting Company. The deceased, Gerald White, worked for Empire. Work on the Pine Brook shaft began on May 20, 1982, with the contractor using a crane and a wrecking ball to break up the concrete cap. Use of the wrecking ball continued on May 21, 1982. That same day, during a break in the wrecking activity, the ground around the Pine Brook Shaft collapsed, swallowing the crane and causing the death of Gerald White.

Plaintiffs claim that the collapse of the ground was caused by the government's insistence that the entire concrete cap and wall be removed before the filling operation began. Their theory is that the force of the wrecking ball hitting the concrete caused the side wall of the shaft to collapse, thereby allowing the alleged sandy alluvium surrounding the shaft to flow into the void.

## II. PLAINTIFFS' THEORIES OF LIABILITY

Plaintiffs' theories of liability fall into two categories. The first category centers around the allegations that the government failed to disclose the specific hazards of the project and that they failed to mandate and enforce effective safety measures. More specifically, they allege first that the government had specialized knowledge of the hazards of removing the cap and backfilling the shaft in the manner mandated,

yet the government failed to disclose such knowledge. Second, they claim that the government failed to provide in the contract with Empire that Empire take special precautions in light of the peculiar hazards present. Finally, the plaintiffs claim that the government negligently failed to enforce the contractor's compliance with applicable safety regulations.

The second category of theories alleges negligence in the manner in which the government planned and executed the project. Plaintiffs claim that the government knew of alternative methods of filling the shaft which would not have resulted in the tragic accident, yet they negligently refused to implement these methods. They also claim that the government retained control over the method that the contractor could use to backfill the shaft, and that the government failed to exercise that control with reasonable care.

## III. THE DISCRETIONARY FUNCTION EXCEPTION

Before we explain our determination that all of plaintiffs' theories of liability are barred by the discretionary function exception to the Federal Tort Claims Act, we must make a brief examination of the history and interpretation of this exception.

The Supreme Court's first interpretation of this exception was in the case of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In that case, plaintiff sued to recover damages resulting from an explosion of ammonium nitrate fertilizer manufactured at the direction and for the use of the United States. Plaintiff alleged that the United States negligently shipped, or permitted the shipment of, the explosive fertilizer "to a congested area without warning of the possibility of explosion under certain conditions." *Id.* at 23, 73 S.Ct. at 961. Plaintiff also alleged, and the District Court in that case found, that the government "had been careless in drafting and adopting the fertilizer export plan as a whole," *id.*, that certain phases of the manufacturing process had been negligently designed by the United States, and that the government negligently failed to police the loading of the fertilizer onto waiting cargo ships. The Supreme Court held that all of these claims were barred by the discretionary function exception.

■ In reaching this conclusion, the Court in *Dalehite* interpreted the discretionary function exception as barring certain claims, even though the United States, through its employees, may have been patently negligent. 346 U.S. at 33–34, 73 S.Ct. at 966–967. This is because the exception protects "the discretion of the executive or administrator to act according to one's judgment of the best course." *Id.* at 34, 73 S.Ct. at 967. This protected discretion includes "more than the initiation of programs and activities." *Id.* at 35, 73 S.Ct. at 967:

It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision, there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

*Id.* at 36, 73 S.Ct. at 968.

■ In the years since the Supreme Court laid out the parameters of the discretionary function exception in *Dalehite*, many litigants and, indeed, many courts, had come to believe that the view of § 2680(a) expressed in that case was obsolete. The Supreme Court had appeared, in many eyes, to express differing definitions of the exception in cases such as *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and *Union Trust Co. v. Eastern Air Lines, Inc.*, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). Recently, however, in the case of *United States v. S.A. Empressa de Viacau Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660

(1984), the Supreme Court has reaffirmed the validity of its *Dalehite* interpretation of the discretionary function exception.

■ In that case, the Court rejected "the supposition that *Dalehite* no longer represents a valid interpretation of the discretionary function exception," *id.,* 104 S.Ct. at 2763, and went on to clarify the holding in *Dalehite:*

> First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. As the Court pointed out in *Dalehite,* the exception covers "[n]ot only agencies of government ... but all employees exercising discretion." 346 U.S., at 33 [73 S.Ct., at 966]. Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

*Id.,* 104 S.Ct. at 2764.

That *Varig* has stabilized and even changed the course of interpretation of the discretionary function exception has been born out by recent rulings of the Courts of Appeals. Shortly after the Supreme Court decided the *Varig* case, the Court of Appeals for the Third Circuit decided the case of *General Public Utilities Corp. v. United States,* 745 F.2d 239 (3d Cir.1984). In that case, the court addressed the failure of the Nuclear Regulatory Commission to warn the owners of the Three Mile Island nuclear facility of equipment defects that eventually led to a valve failure and to severe damage to the core of the reactor. The court relied on *Dalehite* and *Varig* alone in holding that the Nuclear Regulatory Commission's actions were protected by the discretionary function exception. The court also questioned the continued validity of a pre-*Varig* case that excluded professional and scientific judgments from the discretionary category: "*Griffin* [*v. United States,* 500 F.2d 1059 (3d Cir. 1974)], however, must be read cautiously because in *Varig* the discretionary exception covered an agency decision that rested on highly technical information." *General Public Utilities,* 745 F.2d at 246. The court continued in a footnote: "We need not determine the continued validity of *Griffin* here, but note that our pre-*Varig* cases on the discretionary function must be re-evaluated." *Id.* at 246, fn. 8.

In light of this recent evolution of the discretionary function exception, we are constrained in evaluating plaintiffs' case to avoid unwarranted reliance on pre-*Varig* cases other than the Supreme Court's own *Dalehite* decision. For the reasons that follow, we find *Dalehite* and its recent progeny controlling and therefore dismiss all of plaintiffs' claims.

### A. *Failure to Disclose Hazards and Mandate Safety Measures*

Plaintiffs' first set of liability theories revolves around the failure of the government to disclose the special hazards of the project, and its concurrent failure to mandate effective safety measures. Plaintiffs allege, and we accept as true for purposes of this motion, that the government knew that the soil surrounding the mine shaft was sandy alluvium that could easily flow and collapse in the event that one of the sidewalls of the shaft collapsed. We also accept as true that the government in its contract with Empire failed to provide for the safety of Gerald White and his co-workers, other than by inserting the following clauses into the contract:

> It is the responsibility of the contractor to provide for the security of all shafts ... from the time the contractor starts until the final project work is approved. This will include but not be limited to fences, gates, warning lights, etc. The contractor's personnel are to be informed that the stability of the caps and the sidewalls of the shafts are unknown and safety gear shall be used while work is in progress around the shafts.

"Backfilling Shafts: Scope of Work" Section of Contract, at 4; and

> 6. Safety and Health
>
> (a) The contractor shall comply with all applicable occupational safety and

health standards relating to construction prescribed in 29 C.F.R. Part 1926.

(b) If the Contractor fails or refuses to promptly comply with the requirements of this clause, the Contracting Officer, or his authorized representative, shall notify the Contractor of any noncompliance and indicate to the Contractor the action to be taken. . . .

(c) In the event the Contractor fails or refuses to promptly comply with the compliance directive issued under paragraph (b) above, the Contracting Officer or his authorized representative may issue an order to suspend all or any part of the work . . . . Failure of the Contracting Officer or his authorized representative to order discontinuance of any or all of the Contractor's operations shall not relieve the Contractor of his responsibility for the safety of personnel and property.

"General Conditions" Section of Contract at 3. Plaintiffs argue that it was negligence for the government not to specifically require the establishment of a "collapse zone" based on the predicted angle of repose of the surrounding soil, and not to specifically mandate the use of safety harnesses and anchors for people and equipment working within the "collapse zone."

■ Even assuming that the government was negligent in failing to inform the contractor of the sandy nature of the soil, and the concomitant danger of collapse, and even assuming that the government was also negligent in failing to specifically mandate particular safety measures, we cannot find that plaintiffs' theories fall outside of the discretionary function exception. As outlined above, this exception applies to "determinations made by executives or administrators in establishing plans, specifications, or schedules of operations." *Dalehite, supra,* 346 U.S. at 36, 73 S.Ct. at 968:

"Where there is room for policy judgment and decision, there is discretion." *Id.*

That decisions concerning the safe execution of a project are discretionary is confirmed in recent post-*Varig* decisions by the various Courts of Appeals.[1] Our own circuit in the case of *General Public Utilities Corp. v. United States,* 745 F.2d 239 (3d Cir.1984), addressed a claim that the Nuclear Regulatory Commission failed to disclose the existence of a dangerous condition at a nuclear power plant and the information that could have been used to prevent a near disaster. This claim is very close to the instant claim that the government failed to specifically bring to the contractor's attention the hazardous soil conditions and collapse danger and failed to mandate the safety precautions that could have ameliorated that danger. The Third Circuit ruled that the failure to disclose fell within the discretionary function exception. In arriving at this ruling, the court noted that "when an agency determines the extent to which it will supervise the safety procedures of private individuals, it 'is exercising discretionary regulatory authority of the most basic kind.' " *Id.* at 243, quoting, *Varig Airlines, supra,* 104 S.Ct. at 2768.

In arguing against application of this principle to the instant case, plaintiffs rely heavily on the pre-*Varig* case of *Toole v. United States,* 588 F.2d 403 (1978). They argue that this case stands for the proposition that the government's failure to disclose the collapse hazard in the contract or specifications, and its failure to mandate ameliorative safety precautions is not barred by the discretionary function exception. In *Toole,* an independent contractor of the government violated a specific directive of a government inspector when it failed to test a safety shield for one of its

1. *See Feyers v. United States,* 749 F.2d 1222 (6th Cir.1984) (government decision to delegate safety responsibility to a contractor is a discretionary function despite retention of the right to inspect and stop work); *Ford v. American Motors Corp.,* 770 F.2d 465, 462 (5th Cir.1985) ("We agree with our colleagues of the Fourth and Tenth Circuits that both the evaluation of actual or suspected hazards, and the decision to proceed in a particular manner in light of those hazards, are protected discretionary acts, not subject to tort claims in the district court."); *Begay v. United States,* 768 F.2d 1059 (9th Cir. 1985) ("Some of the agencies involved in this case did have some type of authority to regulate activity in the mines. These agencies . . . chose to either implement safety regulations in the uranium mines, or not to. These decisions are clearly within the ambit of the Supreme Court's decision in *Varig* covering regulatory agencies.")

workers at the required level of stress. The worker, who was assembling explosives, was killed when the shield failed in a subsequent explosion. The government knew, prior to the explosion, that the shield had not been tested properly, yet it failed to warn the worker. The court held in a footnote that plaintiff's failure to warn claim was not barred by the discretionary function exception:

The decision whether or not to warn Mrs. Toole did not require any judgments about policy. The Government did not need to reach "a balance of such factors as the cost of Government programs against the potential benefit."

588 F.2d at 403.

Aside from the problem that *Toole* is a pre-*Varig* case and therefore based on a suspect interpretation of the discretionary function exception, (*Toole* is based on *Griffin*, the case the Third Circuit questioned in the *General Public Utilities* case), *Toole* is also readily distinguishable from the instant case on its facts.

In *Toole*, the government employees knew specifically what the danger was and specifically who was at risk. Indeed, the independent contractor was violating a direct order of the Government, and the inspector knew of the violation and the great danger it posed long before the accident happened. In the instant case, we find quite a different scenario.

First, it is clear from the contract that the government elected to delegate primary safety responsibility to the contractor. The government specified in the contract that "[i]t is the responsibility of the contractor to provide for the security of all shafts ..." and that the contractor "shall take proper safety and health precautions to protect the work, the workers, the public, and the property of others." Further, although the government reserved the right to enforce the government's own Occupational Safety and Health Administration regulations found in 29 C.F.R. Part 1926, it made clear in the contract that in the event of a violation of the regulations, "[f]ailure of the [government] to order discontinuance of any or all of the Contractor's operations shall not relieve the Contractor of his responsibility for the safety of personnel and property."

The inclusion of this clause in the contract along with the other above-quoted clauses makes it uncontrovertible that the government delegated full safety responsibility to the contractor.[2]

Second, unlike *Toole*, there was no known violation of a specific government directive. As part of its decision to delegate primary safety responsibility to the contractor, the government did not dictate particular precautions the contractor should take; rather, the government, in the contract, issued a general warning that the stability of the caps and sidewalls of the Pine Brook Shaft was unknown. Unlike in *Toole*, the responsibility for taking safety precautions in light of these unknowns was expressly delegated to the contractor.

---

2. *See Maltais v. United States,* 546 F.Supp. 96 (N.D.N.Y.1982), *aff'd,* 727 F.2d 1442 (2d Cir. 1983), where the court held as a matter of law that the government had delegated responsibility for safety on a construction project to the independent contractor, despite the fact that the government reserved the right to stop work in the event that government regulations were violated. The court went on to hold that this delegation of responsibility prevented the United States from being held for the negligence of its contractor:

It is well settled that the contractual reservation of the right to stop work ... does not in itself create a duty in the Government. *Alexander v. United States,* 605 F.2d 828 (5th Cir. 1979); *Fisher v. United States,* 441 F.2d 1288 (3d Cir.1971); *Jennings v. United States,* 530 F.Supp. 40 (D.D.C.1981). In other words, the

mere fact that ERDA retained the right to stop work on the project for GE's failure to comply with safety regulations is not enough to change GE's status as an independent contractor to that of an agent of the United States for purposes of the Federal Tort Claims Act. *Id.* at 101. Finally, the court concluded that "ERDA's delegation of safety responsibility ... is a discretionary act ... and therefore gives rise to an exemption from FTCA liability.... Indeed, ERDA's reluctance to attempt to monitor day to day safety procedures, while it retains both the right of inspection and the right to stop work if serious violations are reported, demonstrates discretionary policy considerations which required a weighing of various concerns for public safety against administrative impracticability of maintaining a large inspection staff." *Id.*

The final and definitive difference between *Toole* and the instant case is that the decision to delegate safety responsibility to the contractor in this case, and the concomitant failure to specifically warn of the collapse danger and to require specific safety precautions, *did* require judgments about policy.

The decision to delegate safety responsibility clearly calls for this type of judgment. It involves balancing the costs of the government providing detailed safety instructions and performing detailed research and testing to determine what precautions are needed for a particular project against the possibility that the contractor will not effectively carry out its delegated safety responsibility. The decision to delegate safety responsibility to the contractor is therefore discretionary and protected by the discretionary function exception. *See Feyers, supra,* 749 F.2d at 1227 ("The United States' decision to delegate safety responsibility to Chrysler, to conduct only 'spot checks' of Chrysler's safety programs, and to not institute a safety training program for railyard workers are clearly the type of discretionary functions protected by 28 U.S.C. § 2680(a)").

Further, the specific decision not to specifically inform the contractor of the special hazards of the project, including the possible presence of sandy alluvium and the concomitant danger of collapse is also discretionary. In light of the unknown condition of the shaft walls, and therefore the unknown stability of the surrounding soil, the government was forced to balance the cost of determining the condition and stability of the shaft walls and adjacent ground against the potential benefit of such testing. In the end, the government judged, rightly or wrongly, that the best way to proceed was to warn the contractor in the contract of the unknowns involved with the project and to allow the contractor to perform such tests and implement such precautions as it saw fit. The decision to specifically inform the contractor in the contract of the unknowns, and to make available to the contractor at the Office of Surface Mining all known information about the project, and about the dangers of such projects, involved the balancing of the costs of duplication of the material and supervision of the contractor as he reviewed it against the possibility that the contractor would fail to avail himself of the opportunity to view the project file at the government office.

In retrospect, this decision may have been negligent, but it cannot be denied that the decision whether or not to warn the contractor in the contract of the specific possibility of a cave-in due to the alluvial nature of the surrounding soil was a policy judgment within the meaning of *Dalehite* and its recent progeny. The decision by the Office of Surface Mining not to provide the contractors with copies of all the data in the Pine Brook Shaft project file was a policy decision within the meaning of the exception. It is uncontroverted that the project file, including a copy of the publication "Treatment of Disused Mine Shafts and Adits" was available for inspection at the Office. It is also uncontroverted that this file contained information about collapse dangers during the backfilling of mine shafts, and measures that could be taken to prevent such occurrences. The government's choice to disclose its knowledge of the potential dangers in this manner involved weighing costs against benefits. In this era of tight federal budgets, the decision to disclose information by making it available for inspection is a policy judgment within the meaning of *Varig, Dalehite,* and the discretionary function exception.

Aside from alleging that the government was negligent in failing to inform the contractor of specific hazards, and in failing to mandate specific safety measures, plaintiffs also claim that the government was negligent in failing to enforce compliance with applicable safety regulations. Plaintiffs argue that the government failed to enforce the safety measures set forth in 29 C.F.R. Part 1926, although Plaintiffs fail to pinpoint precisely which safety measures were not enforced. A careful reading of the regulations and of the depositions, affidavits, and other supporting material in this case indicates that the only possible

regulations that were not followed or enforced were those having to do with the establishment of an angle of repose and the wearing of personal protective equipment.

We have already established that the primary responsibility for safety was delegated to the contractor. In such a situation, the only circumstance where the government can be held liable for negligent inspection or enforcement is where a specifically mandated safety measure is not taken. *See Feyers, supra,* 749 F.2d at 1227 ("While the discretionary function exception does not apply where mandatory guidelines or regulations are violated, ... this rule is inapplicable in this case since neither the AMC Safety Manual AMC 385–100 nor any other provision of the contract required specific safety measures in the railyard.").

In this case, although compliance with 29 C.F.R. Part 1926 was mandated in the contract, the provisions concerning the establishment of an angle of repose and the wearing of personal protective equipment do not require specific safety measures to be taken in specific situations. Neither the personal protective equipment regulations, 29 C.F.R. § 1926.28 and 29 C.F.R. §§ 1926.-100–107, nor the angle of repose regulations, 29 C.F.R. § 1926.651(e), are expressly aimed at mine shaft backfilling operations. In fact, both sets of regulations place on the employer, or the contractor in this case, the responsibility for determining when such precautions should be taken and how they should be implemented. The protective equipment regulations state that "the employer is responsible for the wearing of appropriate personal protective equipment ...." 29 C.F.R. § 1926.28. The angle of repose regulations provide that,

(e) The determination of the angle of repose and design of the supporting system shall be based on careful evaluation of pertinent factors such as: Depth of cut; possible variation in water content of the material while the excavation is open; anticipated changes in materials from exposure to air, sun, water, or freezing; loading imposed by structures, equipment, overlying material, or stored material; and vibration from equipment, blasting, traffic, or other sources.

29 C.F.R. § 1926.661(e).

The government elected to assign the responsibility for making these determinations to the contractor when it delegated safety responsibility to the contractor. We have already determined that this decision was discretionary. The second decision concerning the manner of enforcing these regulations is also discretionary. The government could not affirmatively enforce these regulations, or mandate the use of particular safety equipment and procedures without first determining the necessity of such equipment and procedures. This would have involved carefully evaluating the factors outlined in the regulations quoted above. The subsequent decision of the government not to make the determinations required by § 1926.651(e) itself just to check up on the contractor was discretionary because it involved the balancing of the efficacy of itself determining the soil characteristics, the condition of the shaft walls, and the amount of additional load on the surrounding soil, against the cost of making such determinations.

As we have already noted, the Supreme Court in *Varig* definitively held that "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig Airlines,* 104 S.Ct. at 2768. This holding has been applied by the Third Circuit not only in regulatory situations, but also in the context of government supervision of an independent contractor. In the recent case of *Merklin v. United States,* 788 F.2d 172 (3d Cir. 1986), the court held that the Atomic Energy Commission's decisions about the method and manner of safety inspections of an independent contractor's radioactive ore processing plant are committed to the agency's discretion. The agency could not, therefore, be held liable for allegedly negligent inspections. The same reasoning holds true for the instant case. The government cannot be held liable for allegedly negligent failure to enforce where a decision to affirmatively enforce would

have entailed extensive testing and determinations duplicative of the determinations the contractor was charged with making.[3]

### B. *Negligence in Planning and Controlling the Project*

Plaintiffs' second set of liability theories is even more clearly barred by the discretionary function exception to the Federal Tort Claims Act than the first. In this second set of claims, plaintiffs allege that the decision to mandate complete removal of the concrete cap over the wall surrounding the Pine Brook Shaft, and the decision not to alter this approach when the contractor requested an alternate procedure were negligently made. Essentially, plaintiffs charge negligent planning of a federal government project.[4]

The Supreme Court in *Dalehite* expressly ruled that "negligence in policies or plans for authorized governmental activities cannot support damage suits." *Dalehite, supra,* 346 U.S. at 36, n. 32, 73 S.Ct. at 968, n. 32. That the allegedly negligent planning activity that took place in the instant case is of the type protected by the discretionary function exception is born out by the experimental character of the backfilling project. In order for planning activity to be protected, it must involve some policy judgment. In the instant case, the government made the decision to use a new backfilling method patterned on the English method in order to avoid later settling of the surface of the backfilled shaft. Because use of this new method, and the government's later refusal to alter its method when requested to do so by the contractor, are both clearly protected by the discretionary function exception, plaintiffs' claims for negligent planning and control are squarely within the coverage of the discretionary function exception.

## IV. CONCLUSION

We find that all of plaintiffs' claims are barred by the discretionary function exception to the Federal Tort Claims Act, and we will therefore grant the government's motion and enter summary judgment against plaintiffs on all counts. Because of the procedural history of this case, of which the parties are well aware, we were initially reluctant to even entertain this motion, let alone decide it in this manner. We are, however, convinced that our decision is in accordance with the law, and we therefore grant the government's requested relief.

---

**3.** Plaintiffs rely heavily on *McMichael v. United States,* 751 F.2d 303 (8th Cir.1985) for the proposition that the discretionary function exception does not bar its negligent failure to affirmatively enforce claim. In *McMichael,* the government inspectors' regular procedures "included a fifty-one step procedures review checklist for safety compliance." *Id.* at 307. The court held that

the Defense Department inspectors were not called upon to make discretionary regulatory judgments. Rather, they had a number of precise inspections to perform which involved no judgment concerning agency policy ...

*Id.* The Third Circuit has recently limited the application of *McMichael.* In *Merklin,* the court stated,

We believe that *McMichael* must be read narrowly to apply only to those situations where no policy judgment is implicated.

*Merklin, supra,* 788 F.2d at 172. Because the policy judgment not to duplicate the determinations assigned to the contractor is implicated in the instant case, *McMichael* does not apply.

**4.** It is unclear in plaintiffs' brief and in the pretrial memorandum whether they are also alleging that, beyond negligently controlling the project, the government exercised such substantial control over the project that the contractor became an agent of the government and the government was therefore liable for the contractor's own negligence. If plaintiffs do in fact make this claim, it is unfounded. It is clear from the materials submitted by the parties in relation to the summary judgment motion that the only control the government retained was over the particular backfilling method to be used by the contractor. As the Third Circuit held in *Merklin,*

According to the Supreme Court's decision in *Orleans,* the fact of a broad supervisory control, or even the potential to exercise detailed control, does not convert the independent contractor into an agent of the United States for FTCA purposes. Simply retaining control of the manner in which the independent contractor's work was to be performed is insufficient government involvement on which to predicate liability.

*Merklin, supra,* 788 F.2d at 175.