**Kevan BERKOVITZ, a minor by his parents and natural guardians Arthur BERKOVITZ, his wife, Donna Berkovitz, and Arthur Berkovitz and Donna Berkovitz, in their own right,**

v.

**UNITED STATES of America, Appellant.**

No. 86–3444.

United States Court of Appeals, Third Circuit.

Argued Feb. 19, 1987.

Decided June 30, 1987.

Rehearing and Rehearing In Banc Denied July 22, 1987.

Richard K. Willard, Asst. Atty. Gen., J. Alan Johnson, U.S. Atty., Nanette R. Everson (argued), Special Counsel, John F. Cordes, Atty., Civ. Div., U.S. Dept. of Justice; Ann H. Wion, Associate Chief Counsel for Enforcement, Food and Drug Admin., Rockville, Md., of counsel, for appellant.

Daniel M. Berger, Ellen M. Viakley (argued), Berger Kapetan Malakoff & Meyers, P.C., Pittsburgh, Pa., Stanley P. Kops, Walter Kyle, Adler and Kops, Philadelphia, Pa., for appellees.

Before HIGGINBOTHAM and SLOVITER, Circuit Judges, and ROTH, District Judge *.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

### Issue

In *Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974), this court held that a suit alleging negligence on the part of the Division of Biologic Standards (DBS) in approving for production and distribution a polio vaccine which subsequently caused the plaintiff's paralysis was not barred by the discretionary function exception to United States liability under the Federal Tort Claims Act (FTCA). In *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court held that the discretionary function exception barred an FTCA suit based on the negligence of the Federal Aviation Administration (FAA) in certifying an aircraft that did not comply with applicable safety regulations. The FTCA action before us makes allegations of government negligence virtually indistinguishable from those asserted in *Griffin.* The question before us on this interlocutory appeal is whether our holding in *Griffin* remains binding following the Supreme Court's pronouncement in *Varig* on the scope of the discretionary function exception.

### II.

### Facts

The government sought and was granted certification pursuant to 28 U.S.C. § 1292(b) of the district court's order denying its motion to dismiss this action for lack of subject matter jurisdiction under Fed.R. Civ.P. 12(b)(1). The district court was obliged to accept the factual averments of the complaint as true for purposes of the motion. *See Curtis v. Everette*, 489 F.2d 516, 518 (3d Cir.1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974). Our review is plenary. Berkovitz's amended complaint alleges the following facts.

Kevan Berkovitz, a minor, received a dose of Orimune, a Sabin Oral Poliomyelitis Vaccine manufactured by Lederle Labora-

* Honorable Jane R. Roth, United States District Court for the District of Delaware, sitting by designation.

tories (Lederle), on May 10, 1979 and contracted paralytic poliomyelitis within a month. The Communicable Disease Center, a United States agency, determined that Berkovitz had contracted polio from the vaccine.

Prior to 1972, the Division of Biologic Standards (DBS), a division of the National Institutes of Health, licensed Lederle to produce a trivalent oral vaccine using live virus of the Sabin strains. Lederle then developed from the original Sabin strains a seed virus which DBS licensed it to produce despite the fact that it did not satisfy standards for neurovirulence set forth in the regulations applicable to live polio vaccines. After 1972, a division of the Food and Drug Administration (FDA) took over responsibility for approval and licensure of live polio vaccines. The FDA approved a monopool of virus [1] developed from the defective seed virus for use in production despite the fact that the monopool was tested and found to exceed the applicable standards for neurovirulence. This defective monopool was subsequently used by Lederle in the manufacture of the lot of trivalent oral polio vaccine, Orimune, administered to Berkovitz.[2]

Berkovitz (joined by his parents as his guardians) filed a complaint in federal district court, after following the requisite administrative procedure. The complaint asserts a claim against the United States under the Federal Tort Claims Act for the negligence of DBS in licensing and of the FDA in approving for release the live polio vaccines.[3] Specifically, Berkovitz alleges that he suffered damages as a result of: 1) the negligence of DBS in licensing Lederle for the original Sabin strains; 2) the negligence of the FDA in approving for production and release the lot of trivalent vaccine manufactured from the defective mono-

pool; 3) the negligence of the FDA in failing to withdraw the defective vaccine from the market; and 4) the negligence of the FDA in failing to require Lederle to warn of the risks of the defective vaccine.

The government moved for dismissal for lack of subject matter jurisdiction on the grounds that the agency actions challenged fall within the discretionary function exception to the United States' waiver of sovereign immunity under the FTCA. In ruling on the government's motion, the district court relied on this court's prior decision in *Griffin*:

> In *Griffin*, the plaintiff sustained personal injuries resulting from the ingestion of a [vaccine] which did not conform to the defendant's regulations. The Third Circuit concluded that the government was not immune from suit pursuant to the discretionary function exception ... since the government employee's conduct in implementing agency regulations required only scientific evaluation and not the formulation of policy.

App. at 51–52. The court rejected the government's argument that the *Griffin* holding does not survive the Supreme Court's subsequent decision in *Varig*. The district court stated that under Third Circuit Internal Operating Procedure 8.C., "no matter how persuasive the arguments may be that *Griffin* is no longer valid, we are bound to apply the principles in *Griffin*." App. at 55. Applying those principles, the court concluded that the discretionary function exception barred Berkovitz's claims of "alleged failure to warn and withdraw the product" but did not bar Berkovitz's claims of "negligent licensure and approval" of either the original Sabin strains or the lot of vaccine administered to Berkovitz. App. at 56.[4]

---

**1.** There are three types of the Sabin strains of poliovirus: Types I, II and III. A monopool is a single type. When monopools of the three types are combined, they form a trivalent vaccine.

**2.** Although the government contends that it followed all mandatory regulations in licensing Lederle to produce Orimune and in approving for production and release the lot of vaccine administered to Berkovitz, it agrees that for

purposes of this appeal, we must assume Berkovitz's allegations of negligence to be true. Appellant's Brief at 4 n. 3.

**3.** Berkovitz also initiated an action against Lederle. That action was settled.

**4.** On appeal, Berkovitz concedes that his claims for negligent failure to warn or withdraw are barred by the discretionary function exception. Appellee's Brief at 3.

## III.

### *The Legal Background: Griffin and Varig*

Under the FTCA, the United States waives its sovereign immunity from suit for compensatory damages for personal injury resulting from the conduct of a government employee acting within the scope of his employment. 28 U.S.C. §§ 1346(b), 2674. One of the exceptions to which that waiver is subject provides that the United States does not waive its sovereign immunity from actions "based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a). We have treated the discretionary function exception as establishing a jurisdictional bar. *See Smith v. Johns-Manville Corp.*, 795 F.2d 301, 306 n. 8 (3d Cir.1986); *Gibson v. United States*, 457 F.2d 1391, 1392 n. 1 (3d Cir.1972). The government contends that Berkovitz's action falls within the discretionary function exception and is barred by the United States' sovereign immunity.

Reading Berkovitz's complaint in the way most favorable to Berkovitz, it is clear that, at least in part, Berkovitz alleges a violation of regulations identical to those at issue in *Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974). Griffin, who had contracted polio after ingesting a Sabin type polio vaccine, sued the United States alleging DBS negligence in releasing the vaccine at issue. At that time, as now, agency regulations allowed release of vaccine only if, after a "comparative evaluation" of five criteria with a reference strain of vaccine, "a comparative analysis of the test results demonstrate that the neurovirulence of the test virus pool does not exceed that of the NIH Reference...." *Id.* at 1062–63 n. 7 (quoting 42 C.F.R. § 73.114(b)(1)(iii) (1974) (now codified at 21 C.F.R. § 630.16(b)(1)(iii) (1987))). Tests performed by DBS indicated that the vaccine at issue displayed greater neurovirulence than the reference on all five enumerated criteria. *Id.* at 1067 & n. 18. Griffin contended that DBS could be held liable for its release of the vaccine in violation of its own regulations. The government contended both that the decision to release the lot of vaccine in question involved the exercise of a discretionary function and that "Congress intended, by the discretionary function exception ..., to exclude all claims 'arising from acts of a regulatory nature.'" *Id.* at 1063.

We noted that "accepting the Government's [latter] contention would effectively immunize all Governmental activity from judicial review except the most ministerial acts." *Id.* at 1063–64. Instead we construed the decision in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), as limiting the discretionary function exception to activity involving "considerations of public policy", 500 F.2d at 1064, focusing on the Court's statement in *Dalehite* that "[w]here there is room for policy judgment and decision, there is discretion." 346 U.S. at 36, 73 S.Ct. at 968 (quoted in 500 F.2d at 1064).

Although we accepted DBS' construction of its regulations as allowing "judgmental determination as to the degree to which each of the enumerated criteria indicated neurovirulence in monkeys," we concluded that this was "a scientific, but not policymaking , determination." 500 F.2d at 1066. We pointed out that "responsibility was limited to merely executing the policy judgments of the Surgeon General." *Id.*

For this reason, we concluded that DBS' discretion in "performance of scientific evaluation" did not justify immunization from judicial review. *Id.* Moreover, we noted that DBS had no discretion "to disregard the mandatory regulatory command" under the "biological variation" rubric that it had applied and that DBS had exceeded its authority under the regulations by "discounting test results that were required to be considered significant." *Id.* at 1068. We concluded:

> We do not hold that the Government may be liable for policy determinations made by its officials. Rather, we hold only that the Government may be liable where its employees, in carrying out their duties, fail to conform to pre-existing statutory and regulatory requirements.

*Id.* at 1069.

In this case, Berkovitz's complaint alleges a failure by the government to insure

Lederle's compliance with "applicable regulations, including, but not limited to: ... 42 C.F.R. 73.114(b)(1)(iii)," App. at 29, the same regulation at issue in *Griffin.* Thus, if we are still bound by our holding in *Griffin* that release of a vaccine lot that does not satisfy regulatory criteria is not a discretionary function, Berkovitz's action under the FTCA may be maintained. *See* Internal Operating Procedures of the Court of Appeals for the Third Circuit, Chapter 8.C., discussed in *Poulis v. State Farm Fire & Casualty Co.,* 747 F.2d 863, 867 (3d Cir.1984). On the other hand, if an intervening Supreme Court decision mandates a different result, we may not "countenance the continued application in this circuit of a rule, even of our own devising, which is patently inconsistent with the Supreme Court's pronouncements." *Cox v. Dravo Corp.,* 517 F.2d 620, 627 (3d Cir.), *cert. denied,* 423 U.S. 1020, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). *See also McMahon v. McDowell,* 794 F.2d 100, 108 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986). The government contends that because of the intervening decision in *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), *Griffin* is no longer binding law.

In *Varig* and *United States v. United Scottish Insurance Co.,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), decided in the same opinion, plaintiffs claimed that their injuries or damages from aircraft accidents had resulted from the negligence of the Federal Aviation Administration (FAA) and its predecessor, the Civil Aeronautics Agency (CAA), in approving aircraft designs. Congress granted the FAA authority to exercise its discretion in promulgating regulations governing inspection and licensing of aircraft. The FAA responded with a system under which manufacturers remain responsible for testing and compiling data, while the FAA receives the data for review and retains the option of performing spot-inspections with its own staff or surrogate representatives.

In *Varig,* the FAA had inspected the Boeing 707 before issuing a type certificate approving the aircraft design, but it apparently approved the aircraft at various stages without inspecting the design of the lavatory towel disposal receptacle which did not satisfy applicable safety regulations. The failure of that receptacle to contain a fire proved fatal to 124 persons on board the Boeing 707 aircraft involved in the accident. In *Scottish,* the FAA had approved, without performing its own inspection, an aircraft modification involving installation of a cabin heater which did not meet applicable safety regulations. That heater was the cause of a fire.

In considering the applicability of the discretionary function exception, the Court isolated two relevant factors useful in determining when the exception applies. "First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case". *Id.* at 813, 104 S.Ct. at 2764. The Court stated that the basic inquiry is whether "the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Id.* The second factor was that the exception "plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Id.* at 813–14, 104 S.Ct. at 2764. The Court noted that "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765.

Applying this standard, the Court noted that what was at issue was the failure of the FAA to actually inspect the aspects of the design to which the fires were attributable. The Court construed plaintiffs' claims as challenging "the FAA's decision to implement the 'spot-check' system of compliance review, and the application of that 'spot-check' system to the particular aircraft." *Id.* at 819, 104 S.Ct. at 2767. The Court concluded that the FAA's implementation of a mechanism for compliance review is plainly discretionary activity be-

cause, "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Id.* at 819–20, 104 S.Ct. at 2767. It followed that "the acts of FAA employees in executing the 'spot-check' program in accordance with agency directives are protected" because the FAA employees were empowered to decide how much confidence to place in a given manufacturer's procedures. *Id.* at 820, 104 S.Ct. at 2768.

Following *Varig,* this court has twice questioned the continued vitality of *Griffin.* In *General Public Utilities Corp. v. United States,* 745 F.2d 239 (3d Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985) (*GPUC*), the owners of the Three Mile Island nuclear facility filed an FTCA suit based on the failure of the Nuclear Regulatory Commission to investigate an occurrence at another nuclear plant and to communicate warnings based thereon. We held that the claims were barred because the Commission exercised discretion in making policy determinations to decide when occurrences were significant enough to warrant investigation and warning. *Id.* at 244–46. We rejected plaintiffs' attempted reliance on *Griffin* as "excluding professional and scientific judgments from the discretionary category" both because "*Griffin* ... must be read cautiously because in *Varig* the discretionary exception covered an agency decision that rested on highly technical information" and because the Commission exercised discretion in making non-technical judgments as to public health and safety. *Id.* at 246.

Thereafter, in *Smith v. Johns-Manville Corp.,* 795 F.2d 301 (3d Cir.1986), we again noted that *Griffin's* distinction between scientific evaluation and policy judgments must be read cautiously in light of *Varig. Id.* at 309 & n. 13. In that case, defendants who were sued by present and former employees of Johns-Manville for injuries resulting from exposure to asbestos filed third-party claims against the United States under the FTCA based on the General Services Administration's failure to label asbestos sold to them as part of the government's asbestos disposal scheme. We rejected the third party plaintiffs' claim that the failure to warn, when isolated from the overall decision to dispose of the asbestos "as is," involved no policy judgment. We construed *Dalehite* as precluding this type of compartmentalization of agency decisions, and concluded that, when considered as a whole, implementation of the disposal scheme required the GSA to exercise discretion to "avoid market disturbances" and "maximize the government's revenues." *Id.* at 308. Because these were policy decisions, the discretionary function exception precluded the third party claims. *Id.* at 308–09.

Although the opinions in *GPUC* and *Smith* suggest that *Griffin* must be reevaluated in light of *Varig,* we had no occasion to decide whether *Griffin* is effectively overruled, a position the government now urges us to adopt.

## IV.

### *Does Varig require immunity for all regulatory activity?*

■ The government has asked us to interpret *Varig* to mean that the discretionary function exception "was intended to apply to all claims arising from the regulatory activities of federal agencies." Appellant's brief at 18. Initially, the government relies on the statement in *Varig* that "whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." 467 U.S. at 813–14, 104 S.Ct. at 2764. In addition, the government points to this court's statement in *Smith* interpreting *Varig* as requiring that where "the challenged conduct involves the government acting in its capacity as a regulator of individual conduct, the exception presumptively applies." 795 F.2d at 307.

We do not accept this per se approach. The Fifth Circuit rejected the government's per se interpretation because it ignores the fact that "not all regulatory conduct is

discretionary conduct." *Collins v. United States,* 783 F.2d 1225, 1229 (5th Cir.1986). We agree. The plain language of *Varig* states that the exception applies only to "discretionary acts" of regulators. Our view that the discretionary function exception is inapplicable to non-discretionary regulatory actions accords with the legislative history which indicates that the exception is "designed to preclude application of the act to a claim based upon an alleged abuse of discretionary authority by a regulatory or licensing agency." 467 U.S. at 809, 104 S.Ct. at 2762 (quoting Hearings on H.R. 5373 and H.R. 6463 before the House Committee on the Judiciary, 77th Cong., 2d Sess. 28, 33 (1942) (statement of Assistant Attorney General Shea)). If Congress intended to exempt all regulatory actions from the scope of the FTCA, we are confident it would have said so.

We do not construe the decision in *Bacon v. United States,* 810 F.2d 827 (8th Cir. 1987), as adopting a per se exception for regulatory conduct, as the government suggests. There, a group of road workers filed an FTCA action alleging negligence by the Department of Housing and Urban Development and the Environmental Protection Agency in failing to warn them of the presence of dioxin. In upholding the judgment for the United States under the discretionary function exception, the court did not rely on any per se exemption, but instead reasoned that appellants' claim was based on a failure to perform a discretionary function, i.e. to warn. *Id.* at 830.

Nor do we believe the government's broad position is supported by *Hylin v. United States,* 755 F.2d 551 (7th Cir.1985) (*Hylin II*), *following remand from* 469 U.S. 807, 105 S.Ct. 65, 83 L.Ed.2d 16 (1984). In that opinion, the court directed dismissal of a complaint alleging negligence by a mine inspector in failing to discover a mine operator's noncompliance with mandatory safety regulations. The court held that the discretionary function exception precluded suit because the statute reposed discretion in the mine inspectors to determine both whether non-compliance represented an imminent danger and how and when to require compliance. *Id.* at 554.

If, as the government argues, all regulatory action is per se removed from the FTCA, there would have been no need for the *Bacon* and *Hylin II* decisions, upon which the government relies, to have focused on the discretionary nature of the regulatory acts at issue. Moreover, the post-*Varig* decisions in this circuit would not have made the same inquiry. *See, e.g., Pooler v. United States,* 787 F.2d 868, 871 (3d Cir.), *cert. denied,* ―― U.S. ――, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986) (investigator of drug distribution in a federal hospital had discretion to select, use, and control an informant); *GPUC,* 745 F.2d at 246 (applying exception because agency had discretion to weigh technical and scientific data as well as concerns with public health and safety before choosing a course of action).

Following *Varig,* several Court of Appeals cases have permitted maintenance of FTCA suits based on negligent performance of regulatory agencies, thereby implicitly if not explicitly rejecting the per se theory the government urges us to adopt. *See, e.g., Baker v. United States,* 817 F.2d 560, 565 (9th Cir.1987); *Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1197 & n. 3 (D.C.Cir.1986); *Collins v. United States,* 783 F.2d 1225, 1229 (5th Cir.1986).

In *Merklin v. United States,* 788 F.2d 172 (3d Cir.1986), we made the distinction between cases where no policy judgment was implicated and the case before us there where the agency action at issue, the Atomic Energy Commission's failure to warn in connection with plant inspections, was the subject of its "unbounded" discretion in conducting plant inspections. *Id.* at 175. *See also C.P. Chemical Co. v. United States,* 810 F.2d 34, 39 (2d Cir.1987) (exception applies because "this is *not* a case where an agency ignored its own regulations or the clear mandate of statutory procedure"); *Heller v. United States,* 803 F.2d 1558, 1563 (11th Cir.1986) ("if a government official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard, the decision he makes is discretionary and

within the discretionary function exception. Conversely, if there is a standard by which his action is measured, it is not within the exception") (citations and emphasis omitted). We therefore construe *Varig* as requiring the courts to distinguish between those FTCA suits based on regulatory actions which are discretionary, and which therefore cannot be maintained, and those based on alleged negligence in the performance of a non-discretionary regulatory action.

### V.

#### Application of the Discretionary Function Exception

We must therefore address Berkovitz's contention that he has alleged negligent acts or omissions taken in violation of regulations imposing non-discretionary duties. Berkovitz's complaint alleges negligence both by DBS in licensing Lederle for manufacture of live oral vaccine using the Sabin strains, which it alleges did not meet mandatory regulatory standards, and by FDA in approving release of a vaccine lot produced from a defective seed virus and monopool. For purposes of this decision, we need not treat separately the licensing claim and the lot release claim.

The regulations at issue here are essentially the same as those that were in effect at the time of the *Griffin* decision, where we upheld government liability for negligent approval of a production lot of a vaccine. *Compare* 21 C.F.R. §§ 601.1–601.4, 601.20, 610.1–610.2, 630.10–630.16 (1987) *with* 42 C.F.R. §§ 73.3, 73.5, 73.9, 73.70, 73.76, 73.110–73.117 (1968).[5] The government argues that *Varig* undermines the *Griffin* analysis because the FDA is under no non-discretionary duty to enforce its safety regulations.

■ After *Varig*, it is clear that the discretionary function exception exempts the

United States from claims based on 1) discretionary planning level acts and omissions, *e.g.*, *Merklin*, 788 F.2d at 174 (warning not mandatory under Atomic Energy Act); 2) discretionary operational level acts and omissions, *e.g.*, *GPUC*, 745 F.2d at 244–47 (Commission's discretionary implementation of statutory direction to review safety); and 3) non-discretionary operational level acts and omissions taken in furtherance of planning level discretionary decisions, *see Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–68, 97 L.Ed. 1427 (1953).

■ It is also clear after *Varig* that an agency's promulgation of a regulation specifying standards governing a matter subject to regulation does not without more make the discretionary function exception inapplicable. The necessary inquiry in such a situation is whether the agency retains the discretion whether or how to enforce that regulation. *See GPUC*, 745 F.2d at 244.

The government argues that the safety regulations governing live polio vaccine leave at least as much enforcement discretion to the FDA as the regulations at issue in *Varig* left to the FAA. For this reason, the government contends, the discretionary function exception must apply to FDA approval of polio vaccine even though we must assume for this purpose that the vaccine failed to meet substantive safety requirements set out in the FDA regulations.

The regulations of the FDA and FAA are similar in the allocation of responsibility for compliance with explicit safety regulations. In *Varig*, the Court stated that the FAA certification process is founded upon the notion that "the duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator." 467 U.S. at 816, 104 S.Ct. at 2766. Similarly, the FDA puts the initial responsibility for testing on the manufacturer. *See*

---

**5.** In *Griffin*, we did not address the licensing claim. The district court in that case had found that the August 24, 1960 approval by the Surgeon General of the Sabin strains for use in the United States was "properly discretionary, since no regulation then in effect foreclosed such a judgment." *Griffin v. United States*, 351 F.Supp.

10, 26 n. 20 (E.D.Pa.1972). Because the regulations governing Lederle's licensure for production upon which Berkovitz relies were not promulgated until November 23, 1961, *see id.* at 26, the issue before us on licensing is a different one than that before the *Griffin* district court.

21 C.F.R. § 610.1 (1987) ("[N]o lot of any licensed product shall be released by the manufacturer prior to the completion of tests for conformity with standards applicable to such product. Each applicable test shall be made on each lot after completion of all processes of manufacture which may affect compliance with the standard to which the test applies"); 21 C.F.R. § 601.2 (1987) ("manufacturer ... in the case of an application for a product license, shall submit data ... which demonstrate that the manufactured product meets prescribed standards of safety"); 21 C.F.R. § 630.-10(b)(4) (1987) ("[t]he neurovirulence of the seed virus shall be demonstrated by the following tests to be performed by the manufacturer"); *see also* 42 C.F.R. §§ 73.3, 73.70, 73.110(b)(4) (1968).

The tests to which these regulations apply are those that Berkovitz contends the Lederle virus failed. *See* 21 C.F.R. § 630.-10(b)(2) (1987) ("Poliovirus strains shall not be used in the manufacture of Poliovirus Vaccine Live Oral, unless ... each such strain produces a vaccine meeting the safety and potency requirements of §§ 630.11, 630.15 and 630.16(b)"); *see also* 42 C.F.R. § 73.110(b)(2) (1968) (requiring same tests set out at 42 C.F.R. §§ 73.114(b), 73.115, 73.117). It is therefore evident that looking at the regulations as a whole, it is the manufacturer that is required to perform the tests.

■ Berkovitz can point to no regulation requiring the FDA to do anything. In other words, no regulation imposes a non-discretionary duty.[6] Berkovitz points to the statutory requirement that licenses for products may be issued:

> only upon a showing that ... the products for which a license is desired meet standards, designed to insure the continued safety, purity, and potency of such products, prescribed in regulations, and

licenses for new products may be issued only upon a showing that they meet such standards.

42 U.S.C. § 262(d); *see also* 21 C.F.R. § 601.20(a) (1987) ("[a] product license shall be issued only upon examination of the product and upon a determination that the product complies with the standards prescribed in the regulations in this subchapter"); 42 C.F.R. § 73.5 (1968). Berkovitz contends that the FDA, unlike the FAA, is under a statutory duty to "insure" compliance with its safety regulations. Judge Higginbotham's dissenting opinion also views the statute as imposing a "clear command of federal law" because it creates a duty by the FDA to receive the showing that the vaccine manufacturer must make to the government. However, the FDA's statutory duty is not different in substance from the duty that the Supreme Court in *Varig* found rests with the FAA.

Two illustrations from the statute at issue in *Varig* will suffice to show that the duty imposed on the FAA with respect to receipt of the manufacturer's showing of compliance is similar to the duty on which Judge Higginbotham relies. The applicable statute provides, *inter alia*,

> The Secretary of Transportation shall make, or require the applicant to make, such tests during manufacture and upon completion as the Secretary of Transportation deems reasonably necessary in the interest of safety, including flight tests and tests of raw materials or any part or appurtenance of such aircraft, aircraft engine, propeller, or appliance. If the Secretary of Transportation finds that such aircraft, aircraft engine, propeller, or appliance is of proper design, material, specification, construction, and performance for safe operation, and meets the minimum standards, rules, and regulations prescribed by the Secretary of

---

**6.** In *Baker*, 817 F.2d at 566, the court read 42 U.S.C. § 262(d) and 21 C.F.R. § 630.10(b)(2) as imposing on the FDA a mandatory duty to "not issue a license for manufacturing poliovirus vaccine unless the relevant test data has been submitted." Therefore, it held that the plaintiff's allegation of a negligent failure to require submission of test data was not covered by the discretionary function exception. Here, Berkovitz's complaint can be read as alleging a similar failure to require submission of test data. *See* App. at 30–31. We do not agree, however, that the FDA is under a duty to require submission of test data. Rather, the duty to submit test data rests with the manufacturer. *See* 21 C.F.R. §§ 601.2, 610.1, 630.10(b)(4) (1987).

Transportation, he shall issue a type certificate therefor.

49 U.S.C. § 1423(a)(2). Another section provides:

Upon application, and if it satisfactorily appears to the Secretary of Transportation that duplicates of any aircraft, aircraft engine, propeller, or appliance for which a type certificate has been issued will conform to such certificate, the Secretary of Transportation shall issue a production certificate authorizing the production of duplicates of such aircraft, aircraft engines, propellers, or appliances. The Secretary of Transportation shall make such inspection and may require such tests of any aircraft, aircraft engine, propeller, or appliance manufactured under a production certificate as may be necessary to assure manufacture of each unit in conformity with the type of certificate or any amendment or modification thereof.

49 U.S.C. § 1423(b). The Supreme Court recognized in *Varig* that "the FAA retains the responsibility for policing compliance", 467 U.S. at 816, 104 S.Ct. at 2766, but did not interpret this responsibility as the type of mandate that makes the discretionary function analysis inapplicable. The Supreme Court's treatment of the discretionary function exception in the context of that statute, therefore, also governs our interpretation of the analogous FDA statute. It would be incongruous to conclude that Congress intended the FAA to exercise a lesser supervision over the safety of aircraft than the FDA was to exercise over the safety of polio vaccine, which is what the dissent appears to suggest.

In *Varig*, the Supreme Court concluded that "[t]he FAA's implementation of a mechanism for compliance review is plainly discretionary activity of the 'nature and quality' protected by § 2680(a)." 467 U.S. at 819, 104 S.Ct. at 2767. Reviewing the regulations at issue here, it is evident that in exercising a similar discretion, the FDA has made a policy choice to leave compliance in the first instance to the manufacturer. The FDA enters the verification process only if it exercises its discretion under the regulations to examine manufac-

turer data or perform its own tests. *See* 21 C.F.R. § 610.2(a) (1987) (FDA may demand samples from manufacturer for use in own testing prior to approval); 42 C.F.R. § 73.76 (1968); *see also Griffin*, 500 F.2d at 1065 n. 11 (practice of DBS to perform own tests "because of the lack of reliability of the manufacturers' test results").

In the instant case, the allegation is that the FDA exercised its discretion to verify compliance and then negligently erred in finding compliance. If true, this case would be distinguishable from *Varig* where the agency failed to inspect and did not know of the noncompliance. Here the FDA allegedly discovered the defect. Berkovitz argues that once the FDA had information that the vaccine did not comply with the regulations, it had no discretion to approve either the license for production or the lot for release. There is a certain facial attraction to this contention. On examination, however, this argument is simply that the FDA acted negligently. Indeed, Berkovitz's contention that the FDA was obliged to disapprove the noncomplying vaccine once it learned of the noncompliance is rejected by the Supreme Court's vacation of the *Hylin I* decision where the Court of Appeals had held that the discretionary function exception was inapplicable to the negligent inspection of a mine. *See Hylin v. United States (Hylin I)*, 715 F.2d 1206, 1213–14 (7th Cir.1983), *vacated and remanded in light of Varig*, 469 U.S. 807, 105 S.Ct. 65, 83 L.Ed.2d 16 (1984). On remand, the court held that notwithstanding the inspector's negligence in advising how to correct a known safety risk, the discretionary function exception applied. *Hylin II*, 755 F.2d at 553–54. As we have stated, "the issue of negligence is not relevant to the discretionary function inquiry." *GPUC*, 745 F.2d at 243.

■ Moreover, even if the FDA had decided to methodically examine test results or test vaccine samples itself rather than follow the FAA's decision to spot-check aircraft compliance, this would be a discretionary decision. If we were to hold that an agency's discretionary choice to test all

samples subjects the United States to liability whenever in testing the agency negligently fails to recognize and remove non-complying products, we would inhibit the agency's selection of the mechanism for compliance review. This is precisely what *Varig* instructs us not to do. It follows that when the FDA makes the discretionary choice to examine or test samples which it has discretion not to test, it cannot be held liable for subsequent negligence at the operational level in implementing its decision to test.

In short, Berkovitz has failed to allege a violation of a non-discretionary duty imposed on the FDA by statute or regulations and therefore the discretionary function exception applies.

### VI.

#### Conclusion

■ In summary, *Griffin* isolated one regulation, looked at what appears on its face to be mandatory language, and held that in light of that mandatory language the discretionary function exception was inapplicable. We do not disturb the portions of *Griffin* that hold that an agency's violation of its own mandatory regulation is not a discretionary act. However, *Varig* instructs that a court must determine whether "the basic responsibility for satisfying [the agency's] safety standards rests with the *manufacturer*," and whether "[t]he role of the [agency] ... is merely to police the conduct of private individuals by monitoring their compliance with [the applicable] regulations." 467 U.S. at 815, 104 S.Ct. at 2765. We have interpreted *Varig* as requiring this determination to be made by examining agency regulations as a whole.

■ In light of *Varig*, it is necessary to reevaluate the holding in *Griffin*. The inquiry required by *Varig* demonstrates that the responsibility for compliance with the regulations Berkovitz alleges were violated was that of Lederle, and neither the statute nor the regulations mandate the FDA's choice of how to secure Lederle's compliance. We will therefore reverse the district court's order denying the government's motion for summary judgment and remand with instructions that the court grant that motion.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

The amended complaint alleges the following: At the age of approximately two months, Kevan Berkovitz was administered the Sabin oral polio vaccine by his pediatrician. Less than one month later, this vaccine caused him to sustain a case of paralytic poliomyelitis. Among the disease's many consequences is a curvature of Berkovitz's spine as great as ninety degrees. He requires ventilatory assistance to breathe, and he has lost the use of his arms, legs and hands. These injuries are permanent.

While this is an extremely difficult case, to my view the majority's tilt ignores the clear statutory language that defines the duty of the Division of Biologic Standards ("DBS") to require the submission of test data. By not requiring the government to comply with a statute designed to insure the "safety, purity, and potency" of these drug products, the majority has expanded the discretionary function exception beyond the boundaries of any case reported to date. I respectfully dissent.

The regulations in this field place mandatory duties upon a drug manufacturer, such as Lederle, that seeks to obtain a federal license to market its drug product. First, the manufacturer must make its license application to the Director of the Office of Biologics Research and Review on the forms prescribed by regulation. 21 C.F.R. § 601.2(a) (1987). Second, such application forms must be accompanied by "data derived from nonclinical laboratory and clinical studies [that] demonstrate that the manufactured product meets prescribed standards of safety, purity and potency...." *Id.* Third, where the manufacturer is seeking a license for Poliovirus Vaccine Live Oral, the data to be submitted must "establish that each [poliovirus] strain is free of harmful effect upon administration in the recommended dosage to at least 1 million people susceptible to polio-

myelitis, under circumstances where adequate epidemiological surveillance of neurological illness has been maintained...." 21 C.F.R. § 630.10(b)(2) (1987). Fourth, the manufacturer must "demonstrate[ ]" the neovirulence of each seed virus used in its vaccine with data garnered in its performance of a specified series of tests. 21 C.F.R. § 630.10(b)(4) (1987).

As the majority has recognized, "Berkovitz's complaint can be read as alleging a [negligent] failure [by DBS] to require submission of test data." Maj. typescript at 22 n. 6. In addition, Berkovitz's amended complaint can be read as alleging a decision by DBS to license Lederle's manufacture of this vaccine, even though the test data submitted showed that certain monovalent virus pools had failed the required neovirulence tests.[1] Amended Complaint ¶ 19(g); Joint Appendix at 31. Notwithstanding the prescribed duties of the manufacturer outlined in the preceding paragraph, however, the majority concludes that it is within the DBS's discretion not to require even the submission of required test data, and to license the manufacture of a vaccine that has failed the required tests. This disregards the clear command of federal law:

> Licenses ... *may be issued only upon a showing that* the establishment and *the products* for which a license is desired *meet standards,* designed to insure the continued safety, purity, and potency of such products, *prescribed in regulations,* and licenses for new products may be issued only upon a showing that they meet such standards.

42 U.S.C.A. § 262(d)(1) (West Supp.1987) (emphasis added). Such statutory language creates, at a minimum, a duty[2] to receive the showing that the vaccine manufacturer is, under the regulations, required to make to the government.[3] As the Ninth Circuit recognized last month,

> the Secretary may not issue a license for manufacturing poliovirus vaccine unless the relevant test data has been submitted. *See* 42 U.S.C. § 262(d) [ (1982) ]; 21 C.F.R. § 630.10(b)(2) [ (1987) ]. Agency employees charged with enforcing poliovirus vaccine safety standards must require the submission of the test data. As to that there is no discretion.

*Baker v. United States,* 817 F.2d 560, 566 (9th Cir.1987). The statute also creates a governmental duty not to license a manufacturer that has shown the government that its vaccine is defective. *See Loge v. United States,* 662 F.2d 1268, 1273 (8th Cir.1981) ("The Secretary [of Health and Human Services] has no discretion to disregard the mandatory regulatory commands pertaining to criteria a vaccine must meet before licensing its manufacture or releasing a particular lot of vaccine for distribution to the public."), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982).

The majority believes that this statutory duty is not "different in substance" from the statutory duty of the Federal Aviation Administration ("FAA") that was analyzed by the Supreme Court in *Varig.* Maj. typescript at 23. This belief rests upon a misreading of *Varig* and the federal laws that were considered therein. As the *Varig* Court noted, "[t]he FAA certification process is founded upon a relatively simple notion: *the duty to ensure* that an aircraft conforms to FAA safety regulations *lies*

---

1. Thus, contrary to the majority's characterization, Berkovitz's position is *not* "simply that the FDA acted negligently." Maj. typescript at 25–26; *see, e.g.,* Brief for Appellees at 21 (DBS decided "to allow distribution to the public of a discrete live poliovirus vaccine [that] it *knew* exceeded explicit *regulatory* definitions of what is safe") (original emphasis); *id.* at 36 ("What must be accepted as true is that DBS knew that the vaccine lot in question exceeded the regulatory standard.").

2. That this section creates non-discretionary governmental duties is certainly implied by its subsection that prohibits "interfere[nce] with any officer, agent, or employee of the [Department of Health and Human] Service[s] in the performance of any *duty* imposed on him [or her] by this section or by regulations made by authority thereof." 42 U.S.C.A. § 262(e) (West 1982) (emphasis added).

3. By contrast, this statute creates no DBS duty to receive what the manufacturer is not, by regulation, obliged to send. *See, e.g.,* 21 C.F.R. § 610.2(a) (1987) (product "[s]amples ... may at any time be required to be sent").

*with the manufacturer and operator,*[4] while the FAA retains the responsibility for policing compliance."[5] 467 U.S. at 816, 104 S.Ct. at 2766 (footnote and emphasis added). The FAA's legal duties are limited—as the majority's "illustrations" plainly show, *see* maj. typescript at 23–24—to making, or requiring the manufacturer to make, such tests "as the Secretary of Transportation deems reasonably necessary in the interest of safety," 49 U.S.C.A. § 1423(a)(2) (West Supp.1987), and to "mak[ing] such inspection ... as may be necessary to assure manufacture of each unit in conformity with [its type] certificate...." 49 U.S.C.A. § 1423(b) (West Supp.1987). These statutes are not commands at all. Rather, they amount to requests for the prudent exercise of agency discretion, and they are *truly* different in substance from the statute that *prohibits* vaccine licensure by the government whenever the requisite showing has not been made.

The majority's analysis distorts the discretionary function exception by extending its immunity to a government function that simply is not discretionary. "[F]ederal officials do not possess discretion to" violate federal law.[6] *Pooler v. United States,* 787 F.2d 868, 871 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986). Accordingly, I would affirm the judgment of the district court.

---

4. *Accord Waymire v. United States,* 629 F.Supp. 1396, 1402 (D.Kan.1986) ("in *Varig,* the FAA made a policy decision ... that the owner or manufacturer has the primary responsibility for inspecting the plane and for the complying with FAA regulations").

5. The FAA's choice to fulfill this policing function by "review[ing] the data for conformity purposes by conducting a 'spot check' of the manufacturer's work" is the discretionary function that was assessed by the *Varig* Court. 467 U.S. at 817, 104 S.Ct. at 2766.

6. After carefully analyzing the Supreme Court's *Varig* and *Dalehite* opinions, Judge Bork recently noted that

a decision cannot be shielded from liability if the decisionmaker is acting without actual authority. A government official has no discretion to violate the binding laws, regulations or policies that define the extent of his [or her] official powers. An employee of the government acting beyond his [or her] authority is not exercising the sort of discretion the discretionary function exception was enacted to protect. This proposition is implied in *Varig* and *Dalehite,* and has been uniformly followed.

*Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1196 (D.C.Cir.1986) (footnote omitted).